## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MIRANDA GORDON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, | : | |
| Acting Commissioner of | : | |
| Social Security | : | NO. 23-1917 |

## O P I N I O N

SCOTT W. REID                                                                                  DATE:  January 18, 2024
UNITED STATES MAGISTRATE JUDGE

      Miranda Gordon brought this action under 42 U.S.C. §405(g) to obtain review of the decision of the Commissioner of Social Security denying their[1] claim for Child Disability Benefits ("CDB") and Supplemental Security Income ("SSI").  They have filed a Request for Review to which the Commissioner has responded.  As explained below, I conclude that the Request for Review should be denied and judgment entered in favor of the Commissioner.

I.    *Factual and Procedural Background*

      Gordon was born on July 10, 1998.  Record at 279.  They completed high school and some college.  Record at 305.  They have worked only for very short periods of time, and therefore have no past relevant work.  *Id*.

      On June 18, 2020, Gordon applied for benefits, alleging disability since July 9, 2016, on the basis of major depressive disorder, post-traumatic stress disorder ("PTSD"), autism spectrum disorder, fatigue, arthritis, migraines, and sleep issues.  Record at 304.  Their applications were denied initially and upon reconsideration.  Record at 69, 88, 109, 132.  Gordon then requested a hearing *de novo* before an Administrative Law Judge ("ALJ").  Record at 190.

---

[1] Gordon apparently prefers "they/them" pronouns.  Record at 696.

A hearing was held in this case on September 17, 2021. Record at 41. On November 19, 2021, however, the ALJ issued a written decision denying benefits. The Appeals Council denied Gordon's request for review on March 20, 2023, permitting the ALJ's decision to stand as the final decision of the Commissioner of Social Security. Record at 1. Gordon then filed this action.

II.     *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence which a reasonable mind might deem adequate to support a decision. *Richardson v. Perales*, *supra*, at 401. A reviewing court must also ensure that the ALJ applied the proper legal standards. *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984); *Palmisano v. Saul*, Civ. A. No. 20-1628605, 2021 WL 162805 at *3 (E.D. Pa. Apr. 27, 2021).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). Each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

20 C.F.R. §404.1520(4) (references to other regulations omitted).

Before going from the third to the fourth step, the Commissioner will assess a claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence in the case record.  *Id*.  The RFC assessment reflects the most an individual can still do, despite any limitations.  SSR 96-8p.

The final two steps of the sequential evaluation then follow:

> (iv)  At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.  (v)  At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make the adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

*Id*.

III.    *The ALJ's Decision and the Claimant's Request for Review*

In her decision, the ALJ found that Gordon suffered from the severe impairments of obesity, migraine headaches, depression, an autistic spectrum disorder, attention deficit hyperactivity disorder, and PTSD.  Record at 13.  She found that none of Gordon's impairments, and no combination of impairments, met or medically equaled the severity of one of the listed impairments.  Record at 14.

The ALJ determined that Gordon retained the RFC to engage in a range of light work, with only six hours of sitting and four hours of standing or walking in an eight-hour workday.  Record at 16.  They could frequently push or pull with both lower and upper extremities; frequently handle, finger, and feel bilaterally; occasionally reach overhead, and frequently reach in other directions, bilaterally.  Record at 16-7.  They could never climb ladders, ropes, or scaffolds, but could occasionally do other postural activities, and were limited to moderate noise.  Record at 17.  They could have no exposure to machinery or heights, and only occasional

exposure to fumes, odors, dusts, gases, poor ventilation, vibration, humidity, wetness or extreme cold or heat.  *Id*.

As for non-exertional impairments, the ALJ found that Gordon could perform simple, routine tasks, and make simple work-related decisions.  *Id*.  They could have frequent contact with the public and co-workers, but only occasional changes in work setting.  *Id*.

Relying upon the testimony of a vocational expert who testified at the hearing, the ALJ found that Gordon could perform such jobs as office helper, recreation aide, and marker of retail products.  Record at 29.  She concluded, therefore, that Gordon was not disabled.  *Id*.

In her Request for Review, Gordon does not challenge the ALJ's findings as to her exertional abilities.  She argues, however, that the ALJ erred in rejecting findings of marked limitations in mental functioning made by her treating psychiatrist, her treating psychologist, and the independent consulting mental health expert.

IV.  *Discussion*

A.  *Dr. Borman*

Erica Borman, D.O., a psychiatrist, began treating Gordon in 2017.  Record at 603.  In a Medical Opinion (Mental) form dated October 11, 2021, Dr. Borman indicated that Gordon was "markedly" limited in seventeen out of 24 areas.  Record at 691-2.  These included the ability to remember work-like procedures, to complete a normal workday and workweek without interruption for psychologically-based symptoms, be aware of normal hazards and take appropriate precautions, and adhere to basic standards of neatness and cleanliness.  Record at 691.  In this form, a "marked" limitation was defined as one where "there is a substantial loss in the ability to effectively function."  Record at 691.

Dr. Borman also found that Gordon had an "extreme" limitation in her ability to sustain an ordinary routine without special supervision. *Id*. This meant that Gordon had "no useful ability to function in this area." *Id*. In every other area, Dr. Borman indicated that Gordon was "moderately" limited. Record at 691-2.

The ALJ wrote in her decision that Dr. Borman's opinions were "not persuasive." Record at 27. She explained:

> I am not finding evidence in support of the "marked" limits as they are not consistent with her treatment notes of record. Dr. Borman noted the claimant was compliant with therapy. She routinely described the claimant as well-groomed with good hygiene and appeared well-dressed and no odor noted. The claimant had appropriate behavior and was cooperative, as well as had an ability to work at times, attend school, engage in online dating, and socialize with her boyfriend. While the claimant mostly did have fair insight and judgment noted on mental status examinations, she was otherwise routinely within normal limits. As of October 2021, as well, when this opinion was given, she indicated the claimant's insight was good and her judgment was not impaired. In addition, she was focused, had a logical, goal directed and organized thought process with no abnormal thought content; her associations and recent memory were intact, as were her fund of knowledge and attention span.

*Id*.

Indeed, the treatment note from October 11, 2021, described Gordon as alert and fully oriented, and as having a full and appropriate affect; appropriate dress, grooming and hygiene; normal speech and language; logical, goal-directed, and organized thought process with no loose associations, and an intact memory. Record at 701-2. Dr. Borman also noted there that Gordon had no abnormal thought content, hallucinations, or delusions. Record at 702. Their fund of knowledge was intact, as was their attention span. *Id*. Insight and judgment were unimpaired. *Id*.

Nevertheless, the ALJ's assessment of the October 11, 2021, treatment note was not entirely accurate. Gordon told Dr. Berman that they struggled with showering and brushing their teeth: "Feels it takes so much energy." Record at 693.

5

The note also mentioned depression and anxiety attacks, as well as sleep from 10-12 hours per day.  Record at 693.  This was not atypical of Dr. Borman's notes, which repeatedly mentioned disordered sleep.  Record at 605 (September 21, 2020:  "was sleeping more, up to 18 hrs/day even with stimulants"); 607 (June 30, 2020:  "admits to not leaving the house most days. Sleep inconsistent between 18 hrs and 3 hrs"); 609 (April 7, 2020:  "States they use multiple loud alarms, turns them off in their sleep, etc."); 613 (August 15, 2019:  Symptoms include "severe fatigue"); 679 (July 20, 2021:  "Having trouble sleeping … does not attend to ADLs, showers once a week rarely brushes teeth, etc.").

Further, the ALJ's description of Gordon's "ability to work at times, attend school, engage in online dating, and socialize with her boyfriend" is exaggerated.  As noted, Gordon has only worked for very short periods of time, such as a month or a few months.  Record at 335.  According to her mother, Gordon was let go from their last job for calling out too frequently.  Record at 323.  They left college in their third semester because they were "failing all her classes" and had "failed multiple classes previously."  Record at 50.  Further, according to both Gordon and their mother, Gordon rarely left the house with their boyfriend, but mostly stayed at home with him, playing computer games.  Record at 57, 324.

Thus, Dr. Borman's notes present a rather complex picture.  As the ALJ noted, Gordon had an overall normal mental status every time they were assessed, and their interactions with Dr. Borman seemed unimpaired by any mental health limitations.  Gordon was apparently able to attend their numerous medical appointments.  Nevertheless, they had very persistent issues with sleep and lethargy which interfered with their activities of daily living.

As to this, a December 21, 2018, treatment note from Sarah Valdivieso, a therapist at Center for Families and Relationships, is interesting:

> The therapist inquired more about Andy [Gordon]'s sleep patterns and Andy reported that they have never had a regular sleep schedule and will sometimes sleep for days at a time and then almost not at all.  They further report that they often sleep on their couch though they have a bed in a bedroom.  The therapist used psychoeducation to help Andy consider incorporating sleep hygiene into their daily life (e.g. consistent regular sleep/wake time, monitoring diet, lighting, sound, temperature, etc.).  The therapist used psychoeducation to help Andy to see the mind/body connection and the important role sleep plays in both mental and physical health.  The therapist inquired as to whether or not the client felt improving their sleep is a goal they would be willing to work on, and Andy reported that they feel they are not ready to make this a goal at this time, but stated that they would be willing to continue discussing the topic.

Record at 412.  In the "Assessment" portion of her treatment note, Ms. Valdivieso wrote: "Andy appears to be committed to the process of working on their goals … however, they appear resistant to long-term change (accepting the possibility that they may be able to live independently or find employment)".  *Id*.

What all of this amounts to in terms of Gordon's functional capacity is, of course, a medical decision.  To Dr. Borman, it amounted to numerous marked limitations.  To reviewing agency mental health experts Karen Louise Plowman, Psy.D. (in November, 2020, on initial review) and Frank M. Mrykalso, Ed.D. (in February, 2021, on reconsideration), however, it amounted to moderate limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in adapting or managing oneself; and only mild limitations in concentrating, persisting, or maintaining pace.  Record at 77, 177.

The ALJ adopted the findings of the reviewing agency experts in part, although she found a mild limitation in understanding, remembering, and applying information, based on the intact memory Gordon displayed during mental status examinations. Record at 6. The ALJ also found a moderate limitation in concentration, persistence, and pace, rather than a mild one. *Id*.

Drs. Plowman and Mrykalso obviously did not have the opportunity to see Dr. Borman's report, which post-dated their assessments, but did review the October, 2020, report of the consulting mental health expert, Christopher Patrone, Psy.D., who – as discussed below – found marked limitations. They also saw all Dr. Borman's treatment notes other than those from the October 11, 2021, appointment, which do not differ in a notable way from the earlier notes. Record at 693-715. Therefore, the findings of the reviewing agency experts are not undermined by their not having seen crucial evidence. As such, there is no reason why the parts of their reports adopted by the ALJ should not constitute substantial evidence supporting her decision.

Thus, substantial evidence supported the ALJ's conclusion that Dr. Borman's findings were unsupported by her own treatment notes, and were inconsistent with other medical evidence, such as the opinions of Drs. Plowman and Mrykalso. Accordingly, her conclusion should be upheld. Although a different decision-maker might reach a different conclusion on the same record, this is not the standard applied here; instead, the Commissioner's order (adopting the ALJ's decision) must be upheld where, as here, it is supported by substantial evidence. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

B.     *Dr. Patrone*

Dr. Patrone met with Gordon on October 28, 2020.  Record at 664.  He described Gordon as having a depressed affect and anxious mood, but also as cooperative, writing:  "Her manner of relating, social skills, and overall presentation were adequate."  Record at 666.  Gordon was noted to be fully oriented, with satisfactory grooming, normal thought processes, and appropriate eye contact.  Record at 667.  Upon testing, Gordon's attention and concentration were intact, as were their short and long-term memory.  *Id*.  Their judgment was fair, though their insight was poor.  *Id*.  Intellectual functioning was adequate.  *Id*.  Gordon told Dr. Patrone that they could groom themself, cook, do housework, and shop, although they needed reminders from their mother.  *Id*.  However, they spent most of the day in their bedroom.  *Id*.

In his Medical Assessment (Mental) form, Dr. Patrone found that Gordon was unlimited in the ability to understand, remember, and carry out simple instructions or to make judgments on simple work-related decisions.  Record at 669.  However, he also checked off that they had marked limitations in the ability to interact with co-workers or supervisors, and in the ability to respond appropriately to usual work situations and changes in a routine work setting.  Record at 670.

The ALJ found Dr. Patrone's opinion partly persuasive.  Record at 25.  She did not, however, accept his finding of marked limitations.  She wrote:

> I am not finding evidence in support of the "marked" limits.  It is not supported by the claimant's cooperative demeanor and responsiveness or her appropriate eye contact on this examination.  These limitations are also not consistent with the mental status exams of record routinely noting the claimant had appropriate behavior and was cooperative, as well as reflecting an ability to work at times, attend school, engage in online dating, and socialize with her boyfriend.

Record at 26.

This is clearly similar to the ALJ's analysis of Dr. Borman's opinions, and presents similar difficulties. Again, the ALJ fails to recognize the very limited nature of Gordon's work experiences and social life. Nevertheless, once again, Gordon interacted normally with Dr. Patrone, and he noted her largely normal mental status and normal concentration and memory, yet he found her to have marked limitations in interacting with others.

Thus, as with Dr. Borman, Dr. Patrone's findings of marked limitations were not supported by his own clinical examination and test results, and, although they were consistent with Dr. Borman's Medical Opinion form, they were inconsistent with her observations of Gordon, as set forth both in her report and her treatment notes. Dr. Patrone's findings were also inconsistent with the findings of Dr. Plowman and Dr. Mrykalso. Again, therefore, substantial evidence supported the ALJ's decision to credit Dr. Patrone's report only in part, rejecting the findings of marked limitations.

C.   *Ms. Callahan*

Deborah Callahan, MSN, LCSW, began treating Gordon as a psychologist in 2013, and continued treating her through the date of the hearing, except for a gap in treatment from October, 2018, through April, 2020.[2] Record at 677. At the time of the hearing, she was meeting with Gordon every other week. Record at 60. She submitted to the record letters dated November 3, 2020, and September 8, 2021, in which she described the history of her treating relationship with Gordon. Record at 676, 690.

Ms. Callahan also submitted a Medical Assessment form dated September 8, 2021. Record at 688. In it, she indicated that Gordon was unlimited in many areas, and moderately limited in others. Record at 688-9. However, she indicated that Gordon was markedly limited in

---

[2] It was during this gap in treatment with Deborah Callahan that Gordon treated for five months with Sarah Valdivieso at the Center for Families and Relationships, whose note regarding sleep hygiene is quoted above. Record at 390-417.

the ability to maintain regular attendance and punctuality; complete a normal workday and workweek without interruptions from her psychological symptoms; and deal with normal work stress. *Id*.

Callahan wrote on the form: "Client is intelligent and able to understand instructions. Her autism may impede processing of some things. Her depression and PTSD make it difficult to focus and follow through in a timely manner and have the energy to sustain work activity." Record at 688. Like Dr. Borman, Callahan indicated that Gordon would be absent more than three times in a month as a result of her psychological symptoms. Record at 689.

The ALJ wrote:

> This opinion is not persuasive. It was not supported by her explanation and Ms. Callahan only provided a summary of her treatment with the claimant and not treatment notes. In addition, the other treatment notes in the record largely reflect the claimant's subjective complaints. Nevertheless, despite subjective complaints with regard to problems with social interaction and her ability to perform activities of personal care, the evidence in the record is consistent with no more than moderate limitations in these areas. She had an ability to work at times, attend school, engage in online dating, and socialize with her boyfriend. While she had fair insight and judgment on mental status examination, she had intact memory, a normal attention span, a linear and goal-directed thought process and was regarded as self-reflective and receptive on examination. With Adderall, as well, when compliant, the claimant had improvement in her ability to concentrate, persist or maintain pace, and the marked limitations in this area, along with the absences noted are not consistent with the claimant's response to routine conservative treatment and medication adjustments.

Record at 26-7. (Internal citations to notes from Center for Families and Relationships and from Dr. Borman omitted).

As with her other discussions of the medical opinion evidence, the ALJ's discussion here could be criticized in some respects. Again, the ALJ failed to recognize that Gordon's attempts at work and university study failed, and that her "online dating" resulted in one relationship where "socializing" was limited to hanging out at each other's houses. Further, it is to be expected that psychotherapy notes would "reflect the claimant's subjective complaints."

11

Nevertheless, it remains notable that no mental health treater ever described in a treatment note Gordon's inability to process information or focus, nor did Gordon have many absences from medical appointments. Further, Gordon's mental health records do not mention any effort to establish a regular sleep schedule, although the use of stimulants was mentioned at one point. Record at 605. Instead, Gordon rebuffed the suggestion by therapist Sarah Valdivieso that sleep hygiene be addressed in therapy. Record at 412. It may, therefore, have been legitimate for the ALJ to observe that Gordon's subjective complaints did not entirely match her treatment record.

The ALJ was certainly accurate in describing Gordon's mental health treatment as conservative. She met with her therapist only once every two weeks, and saw her treating psychiatrist, Dr. Borman, every several months to adjust her medications. Record at 60. Although Gordon was hospitalized for psychiatric treatment in her teens, she did not undergo hospitalization or partial hospitalization in the relevant period, and had no emergency room visits for mental health reasons during this time.

As a whole, therefore, the ALJ cited adequate evidence in support of her decision that the marked limitations indicated by Deborah Callahan in her Medical Assessment form were not persuasive. As with Drs. Borman and Patrone, this determination takes account not only of the mental health treatment notes of record, but also of the opinions of Drs. Plowman and Mrykalso. Although it is unusual for an ALJ to reject limitations found by three treating or examining physicians, a decision supported by substantial evidence must be upheld. *Hartranft*, *supra*.

V.      *Conclusion*

In accordance with the above discussion, I conclude that Gordon's Request for Review in this case should be denied, and judgment entered in favor of the Commissioner.


BY THE COURT:

*/s/ Scott W. Reid*

_____
SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE